The final case on calendar for argument today is United States v. Hahn and Wynne. The calendar reflects that counsel for appellants are dividing their time ten minutes each. Mr. Warriner, Mr. Hironaka, whichever of you is going first, when you're ready please approach and proceed. Good morning, your honors. Tim Warriner for Mr. Hahn, who is the appellant. And there's two of us. I think the plan was for me to take ten minutes. Counsel, I mean, Mr. Clark, will you put ten minutes on the clock, please? All right. Okay, your honors. This case, in looking at this case, it is one with rather complicated facts. It is essential that the court consider the unusual role that was carved out for the criminal intelligence unit. The role was to protect the chief. That role began in 2011. It began when there was a surveillance system installed at the chief's personal residence. It began when the chief began to misuse police resources by using CIU to conduct his personal security, to monitor his surveillance system. That surveillance system was upgraded. The tapes were regularly changed. This was an unusual situation. The one thing that I couldn't quite understand in the record was this criminal investigation unit. How big was it? How many people were in it? Where was it housed? Was it all in the same place? I wasn't quite sure what we were talking about. The facts that I could put my finger on right now is that it is housed in one unit of the police station, that the members were admitted through the chief of police. I can't put a finger on how many members there are, but it is a unit that is unlike a patrol unit that is used to writing reports. This is a unit that is engaged in intelligence activities and is not routinely writing reports. So far as the record shows, this is a kind of a select unit? I think there was evidence that it was a select unit, and it was a unique unit in how it was being operated by the chief. The significance of the protective element of this is that that was an aspect of this instituted by the chief, and that was something that was being done before Mr. Hahn was lieutenant in the CIU. When he came on board, that was an acknowledged function of this criminal intelligence unit. There was testimony from multiple people that they would routinely act to protect the chief of police, would change his tapes, and would do all this stuff. Why that is significant is that the government is using evidence of really a misuse of police resources by the chief and officers who are being used by the chief for his personal reasons as supportive of the conspiracy, as supportive of this idea that Mr. Hahn, who did not know Puana, was somehow invested with this knowledge that the police got the wrong person and that was okay. So this is one narrative that could be presented, that he was just doing his job, that protecting the chief was his job. There's a counter-narrative that this was not just protecting the chief. This was something much more that veered into something that was in fact unlawful, and both of those theories were essentially presented, and the jury went with the second one. So what basis do we have to question that? Okay. I think, one, as I said, in looking at the evidence that is evaluating sufficiency of the evidence, the government is arguing that this evidence of protecting the chief, acting in furtherance of this directive that had been there, shows involvement in the conspiracy. And what is not shown, essentially, by the evidence is knowledge. Knowledge is not shown. And the jury, in essence, found that in part by its limited finding that this was a conspiracy to obstruct by alteration and rejecting the other findings, including rejecting the color of law finding, which would have required this knowledge element. I don't know that they rejected it. They didn't check the box. That's true. They did not check the box, and there's not – given the way the instructions were drafted, that's as far as they could go, but that's what they found unanimously. So I think just in viewing the facts, the court has to understand the back story to this and the protective actions that were being done and the misuse of police resources. I want to talk about the instructional error in this case. There was, I contend, an instructional error in that this was a case that, I think quite obviously, called for an instruction on the duration of the conspiracy. And instead of giving that instruction, what the court did is the court dictated to the jury what the duration of that conspiracy was, and it was from 2011 through 2016. The jury was given no option to find any more limited duration of that conspiracy. And it is true that the court applied the standard Ninth Circuit instructions, but guess what? I have searched several times in the Ninth Circuit standards, and I have not found a duration of conspiracy instruction, but I do think that this is a situation where it is just basic instructional law. Was it what they asked for? No, it was not, and that's why I think we're in a plain error situation. But this is not something I think that is so obscure. The court's basic instructional duty is to instruct on essential elements, and the Pinkerton aspect of this made the duration of that conspiracy an important instructional element. Why is this case different from any other Pinkerton case where you don't have a duration of instruction? Why is this different? I mean, I think that there could be Pinkerton cases where there is not an issue, but why that is an issue here is because what was alleged was a multi-object conspiracy. But that's often the case in Pinkerton cases. Yes, and that may be true. In this case, there was the jury. Part of the verdict form allowed for them to find one or more objects, and it was the idea that they ultimately did find only one object that makes the duration instruction essential. The court was giving them an option of finding one or more, but yet it was dictating to them the time frame of the conspiracy. So I think in that sense, that's what should have triggered, and I think it's a basic instruction. So the judge should have known to do this without being requested? It's a basic instructional duty. But wouldn't that be the duty of the attorney? I mean, if it's that obvious, the attorney would have asked for it. In some cases, not in every case. My experience as a trial attorney has been that these instructional issues come up at the end of the case. They are missed oftentimes. People are exhausted. Or judges. That is true, and we've all been there. But I think this is one where that duty, this was not something that is so arcane. Well, didn't the instruction require the jury to find that the offense took place during the scope of the agreement? Yes, it did, and that's referring to the Pinkerton instruction. Yeah, that's what it is. And the problem there is that the judge, as I said, dictated to the jury what that time frame is, and how could the jury not find that something is within the scope of something when they're told it is within the time frame given by the court of this conspiracy? There was a question by the jury indicating that it had adopted that time frame, asking for a series of events within that time frame. So it was just following what the court gave it, and I don't think the jury— Are you saying that the court directed the jury to determine that this was the appropriate time frame? The court didn't use those words, but the time frame was dictated by the court, and there was no other option given. The time frame was given in the conspiracy. Did it come from the indictment? The time frame, exactly. It came from the indictment, and that was just cookie-cuttered into the jury instructions. So what's wrong with that? If the time frame in the instruction mirrors the time frame in the indictment, how is that an instructional error? It is an instructional error because here, where there's a multi-object conspiracy and the jury is given the choice of finding one or more objects, that triggers in the clear need to allow the jury to find the duration of the conspiracy given the object that they find. I thought our cases said that if an indictment charges in the conjunctive, that the jury may find only one of those events to convict. So I don't understand why there would be an instructional error if our precedent allows the jury to do exactly what it did. It may be true that the jury could find only one object to convict of conspiracy. The issue, though, is the attempted obstruction of criminal proceedings counts where there is a Pinkerton element. So if the jury exercises that discretion, finds only one object, then it behooves the jury to find the duration based upon that object. The duration of this conspiracy that they found links to the Pinkerton. What case most strongly supports your argument? I'm going to have to consider that. I haven't found, I think, a case exactly on point. I haven't found anything completely on point. In terms of the court's duty as a matter of plain error, I did cite a recent case that came out by the Ninth Circuit very recently, which uses the standard of a reasonable probability of a different result. It says that that is defined as the court lacking confidence that in the result, a different result would occur. So if we don't lack confidence in the result, then you lose, correct? If the court finds that it lacks confidence, if the court finds that there is a reasonable probability that a different result would have occurred and the court lacks confidence, then I would win. But if we say that we don't lack confidence in the verdict, then you lose, correct? Under that new case that I've cited in my reply brief, that definitely seems to be the standard, exactly. All right. Thank you, counsel. Okay. And can I have a couple minutes for rebuttal? We'll give you one minute because we didn't interrupt you that much. All right. Mr. Hironaka. Good morning, Your Honors. My name is Randy Hironaka. I represent Bobby Nguyen. I guess as the only person here actually from Hawaii, I'm the welcoming committee, so welcome to Hawaii. You feel very welcome. So, you know, I'm asking this court to basically consider the sufficiency issue that we brought up and the prosecutorial misconduct issue. They're kind of interwoven together. And, you know, this is a top-heavy case. I've looked, by the way, at your guys' calendar. I have no doubt this is going to be the most interesting case you guys consider over the next few days. But what I mean by a top-heavy case is that the government proved very clearly guilt on the part of the Kealohas. They proved essentially theft, which in federal court is more commonly wire fraud and money laundering. They proved plenty of motive on the part of the Kealohas to steal from Florence Puana and motive on the part to harm or make Gerard Puana look bad. But there wasn't that type of firm proof against the officers in this case. To consider this, we have to, I think, take a step back, and we have to look at the overall charging in this case, which was, to be honest, equal parts ingenious and, you know, sort of strange. Because if you look at it, Catherine Kealoha wasn't charged with any substantive offenses. So the government necessarily linked any finding of guilt on her to these Pinkerton charges. And it's, you know, again, it's kind of ingenious from the standpoint of trying to get convictions against the officers. But, you know, the reason why that's woven in with the prosecutorial misconduct argument is because all of the evidence that they talked about, the circumstantial evidence, with respect to Lieutenant Hahn and Mr. Wynn, my client, was all tied and then ultimately to these false reports. When the prosecutor talked about in his closing argument, you know, that these guys, the defendants, need to come up here and they need to explain to you why the false reports. But there was no evidence that the reports were false. That was their narrative. That was their position, certainly. But Judge Schroeder asked very important questions about CIU. And I think it's important that we keep in mind that I'm not sure how much this came out in the evidence, but CIU is an intelligence unit. So the prosecutors repeatedly talked during trial about, oh, this is the chief secret police force. It's secret police. But they didn't do reports because they're involved with intelligence gathering, intelligence collecting, intelligence keeping. The reports they made when his house was burglarized or broken into, that wasn't unusual because that had nothing to do with intelligence. So it made every sense that they made those reports. Counsel, wasn't there – I didn't follow that. What kind of intelligence are we talking about and were these reports about the mailbox, were they similar to or different from what you're saying the work of the unit was? That's totally different. The normal work of the unit, I guess is what I meant to say, has to do with intelligence gathering. So that's why they don't generate reports. The work they do is generally – I don't want to use the word classified, but it's not made public, especially to the rest of the department. Intelligence about what? Intelligence about organized crime or about other sensitive law enforcement things that they're not going to give to your run-of-the-mill officers or even detectives. That was a main part of this unit. But when something happened with the chief's mailbox, yes, he shouldn't have called upon CIU to investigate this. He and his wife shouldn't have done that, but that's what occurred. But our clients are merely following orders, and I think that's the important part. Isn't that a defense to committing a crime, that you're following orders? It is a defense from the standpoint that if they are not aware of the conspiracy or the objects of the conspiracy and they're not knowingly or actively joining in that. So are you saying that there was evidence presented to the jury that they were not aware of the conspiracy? So that's sort of the weird thing with the evidence, right? The same evidence that the government provided to say, these are the things that happened or are weird or aren't in keeping with, is the same evidence that somebody else can look at equally and say, he's being ordered to do it. There was multiple testimony from witnesses about how HPD is a military or paramilitary organization. Well, these departments are. But as Judge Bress indicated earlier, all of this evidence was presented to the jury. The jury had the option of convicting or acquitting, and they convicted. So why wasn't the evidence that was presented sufficient to support that conviction? Well, I think that's where, at least I go back to, the ingenious charging of it. And I'm not saying that that's a defense, but the jury was basically given no choice when those charges were tethered to the Kealohas. They were almost required to. The acts were tethered to them. That's the problem. The charges were tethered to them because the acts were tethered to them. The chief directed the people who worked for him to commit certain activities. So the evidence had to show what happened, and the evidence was that these were tethered to the chief and his wife. But there's still a state of mind requirement, and that's our argument here, is that that state of mind was proven beyond a reasonable doubt with respect to the Kealohas on the conspiracy, but not with respect to the officers. What state of mind are you talking about? That they knowingly joined the conspiracy knowing of at least one of its objects and were willing participants knowing the objects, at least one or more of the objects of the conspiracy. That's a state of mind requirement, which is not a physical act. Are you saying they didn't have a state of mind to falsify any reports? I'm saying that they didn't falsify reports, so yes. So if the report said that Mr. Hahn was the one, said that Mr. Nguyen was the one who checked the video and it was actually Mr. Hahn who brought the video, why wouldn't that be false? You mean— Do I have it vice versa? No, you mean Mr. Silva. Silva. So that is—and I guess we want to talk about that now. The one piece of direct, quote-unquote, direct evidence was Niall Silva's testimony, which our argument on that with respect to the sufficiency is the U.S. v. TAM. It's inherently incredible. Correct. But the jury could have found that too. So they could have, and I think— They apparently did. They did. But, you know, what we've cited too in the case law is that it's not an issue of was there any evidence. There's still a standard. When we're reviewing things for sufficiency, and I realize how things look when there's a brief and the arguments are sufficiency. It's sort of like— It's an uphill battle. It is. Because the jury has already rendered a verdict, and we sit here not having heard the testimony. And so for us to say the jury got it wrong, it has to be really, really persuasive that the jury got it wrong. And that's very difficult to establish. It is difficult, and I think our argument is that it's— the reason why they got it wrong is because Niall Silva's testimony, who was the only witness who said that Lieutenant Hahn and Mr. Wynn were a part of any kind of conspiracy— he actually testified he had no conspiracy with the Kealohas— was so bad. It was just so shoddy. Did the district court make some kind of finding as to his credibility as well? I believe Judge Seabright made a comment at sentencing that he found that. I mean, of course, he's not going to reject what the jury supposedly found. But I think the other thing that— So was there a motion made for acquittal after the government presented its case, at which point the judge could have dismissed the indictment if he thought the witnesses were incredible? I believe there was an oral motion. Yeah, and it was denied. It was denied. That's correct. So, you know, on the—I guess that's also—what's also related to this is— shocking and wildly unpopular, but, you know, the government lost the conspiracy charge. And what I mean by that is with every fiber of their evidence, they presented a case that the defendants conspired to frame, convict, and imprison an innocent person. With every fiber of their arguments, they presented those same arguments. And the jury just rejected that. And that brings us to our acquitted conduct issue. But it's not often that we—you know, only a fraction of cases go to trial. And there's a lot clearly from the record that goes into having a trial. We all know that, especially in a lengthy trial like this with multiple defendants. And why—and Judge Seabright was very clear what he was sentencing the defendants for, but that was clearly rejected by the jury, that box was not checked. And I understand what the law says on conspiracy. Ironically, the acquitted conduct issue is sort of an issue that, if you think about it, both sides agree on. Even though there's no circuit split on it, there's commentary from both conservative and liberal justices on the Supreme Court that basically both say this would seem to be a violation of a defendant's Sixth Amendment right to trial. So why, on the rare occasions when we have trials and the jury rejects a conviction on those grounds, do we then proceed to sentencing and essentially bring that all back in and sentence people on a preponderance or clearly erroneous standard? That's a violation of a client's Sixth Amendment right. Well, that's not the law as it presently exists, unfortunately. This has been argued for a generation. I understand. I do. Yes. Thank you, counsel. You've exceeded your time. We will give you a minute for rebuttal. Thank you. Thank you. We'll hear from the government. Thank you. May it please the Court, Daniel Ziff on behalf of the United States. Your Honor, the evidence in this case was sufficient for a rational juror to find both of these defendants guilty beyond a reasonable doubt. Most importantly and most directly, there was the evidence from Neal Silva, who testified before the jury that he came to the police headquarters on the afternoon of the mailbox theft. Derek Hahn instructed him to create the false report documenting that he was the one that recovered it that morning. And as Your Honor noted, the district court at sentencing credited that testimony and said that this is a man who lied multiple times before, but I find, the judge having witnessed the testimony firsthand, that when he took the stand, he was credible at the time of trial. That's not controlling. This is obviously on de novo review. But when it's the defendant's burden to show that this is so improbable, it violates the laws of nature that it can be set aside on sufficiency review. The fact that the district court judge who saw the testimony said it was credible fatally undercuts that effort. So with that direct testimony, we have both Mr. Wynn and Mr. Hahn directly tied into creating this false report in the effort of obstructing an investigation. Well, opposing counsel says the report was not false. What's your response to that? The report of Neal… That there was no evidence that any reports were false. That's…Mr. Wynn testified before the grand jury that he went to the K-LOA residence on the morning of the mailbox theft, and that he and Neal Silva recovered the hard drive and then took it back to headquarters. The documentary evidence from the phone shows that Mr. Silva wasn't involved at all until 2.30 in the afternoon when he got a call to come into the office. So I don't think there's any real dispute as to that record that Neal Silva's… essentially saying that he was there at 8.59 in the morning was incorrect. They were trying to cover up… Even without the Neal Silva testimony, which is directly on point, there was, as the district court held when overturning the Rule 29 motion, he described it as a treasure trove of circumstantial evidence supporting both of these defendants' involvement. That circumstantial evidence started all the way back in 2011, two years before the mailbox theft, when you had Mr. Wynn at the scene when Catherine K-LOA was essentially orchestrating a warrantless search of her uncle's house. Mr. Wynn was there. The next year, he writes a burglary report from the same house claiming that there was someone broke in and disabled the security system, and that report was signed by Mr. Hahn. And then on the events leading up to the actual mailbox, you have Derek Hahn ordering Mr. Wynn to go to the deposition and wait in the lobby when there was no police purpose for him to be there. You have him interviewing the 98-year-old grandmother about the car color. Immediately, two days later, you have Mr. Hahn going to the neighborhood, finding out which car on the street was the white car, which happened to be a mistake. It was actually the neighbor's car. And then on the morning of the mailbox theft itself, you have Catherine K-LOA calling Mr. Wynn three minutes before she calls 911. And then that fits into the testimony of Mr. Silva that then they went on this effort to create the false report and hide Bobby Wynn's involvement. Can you help me out on a question of what this criminal investigation unit was, how big it was, where it was, and what its purpose was? Sure. The testimony was that there was one specific office in the headquarters, the CIU office. I don't have an exact number, but the testimony about the round-the-clock surveillance of Girard after the mailbox theft was that there was 20 to 30 officers involved in that surveillance, although I believe that included some from the regular Honolulu division that came in to work the 12-hour shifts. But I think it's a relatively small section constrained within the office. Structure-wise, it goes directly from the chief of police to the captain, who was actually acquitted by the jury. And below that, Mr. Hahn, and then Wynn was the lowest-level footman. The testimony from multiple police witnesses was that this was a secret organization. One of the testifying officers said that he'd been on the force for 15 years and still didn't really understand what they do, and the only answer is just sort of a vague intelligence about terrorism and organized crime. But the circumstantial evidence shows that this was essentially a unit directly reporting to the chief of police and doing his bidding, which in this case was to corruptly orchestrate the arrest of someone that had angered his family. Counsel, would you respond to opposing counsel's reference to government misconduct? Yes, Your Honor. When my opponent on the other side just quoted what the prosecutor said, he said that the prosecutor stood up and said, why the false report? But that's not actually what he said. He stood up and he said, why the lies? Why the false testimony? Why the false statements? And why the false reports? And that was an entirely acceptable comment on the overwhelming circumstantial evidence of the case and an invitation to defense counsel to essentially rebut that evidence, that circumstantial evidence, at argument. And United States v. Vandering, this court considered virtually identical situation and held that when the prosecutor lays out who has the burden of proof, invites the defense to explain away inconsistencies and uncomfortable facts in the record, that's not an improper invitation or an improper comment on the burden of proof. That's simply an argument that they need to explain themselves. The United States also cited two other cases, Mayers and Tucker, in the brief, which have analogous facts that there's no suggestion by the prosecutor that the defense has the burden to prove his own innocence, but merely inviting argument about the evidence as part of closing argument is entirely acceptable. What about the jury instruction? Sure. Again, Judge Seabright, over the course of probably 30 pages of transcript, went through with the parties over all the jury instructions at the conclusion of the case. The defense at no point during that time requested a duration of the conspiracy instruction. And as they concede, this court should only review for plain error. And again, there are no cases with facts like these where this court has held that a duration of the conspiracy instruction is required. So they can't prove plain error when there's no controlling authority on point. At best, they can point to model instructions in the Third and Sixth Circuit, but there's nothing from this court that would require the district court to have, on its own, sui sponte, instruct the jury on that particular issue. They've also, under the other prongs of plain error review, failed to show that even if one of these Third or Sixth Circuit type instructions had been given, that the jury would have reasonably come to a different result. Nor have they shown the fourth prong that, given their opportunity to present this jury instruction, given the fact that ultimately even these Pinkerton counts didn't appear to affect the judge's sentence, that they haven't shown that this is the type of error that would seriously affect the integrity, public reputation, or the judicial proceedings. Let's see, I've got plenty of time left. Any other concerns or any questions from the court, I'm happy to answer. Out of curiosity, does the record show why there was a— why they chose to steal a mailbox as opposed to something else? There was testimony that at the deposition that there was some suggestion that there were going to be bank statements mailed to the mailbox. And I think if you look at what Catherine Cayloa's actual testimony was, she claims that she went to the mailbox, opened it, looked through the mail, and then put most of the mail back and then locked it again, which doesn't make a lot of sense. But I think, as best we can tell, that there was a suggestion on her part that this was to steal some sort of damaging mail related to the civil suit. But it's not entirely clear. Are the Cayloas—have they appealed? No, they both signed post-conviction sentencing agreements in which they waived appeal. I think Mrs. Cayloa has now filed a 2255 alleging ineffective assistance of counsel and is trying to get around that. But for purposes of direct appeal, no, they both— They waived appeal in this matter in order to— Yeah, so— —plea to another charge or something like that. I think it was—they were convicted at trial, obviously, and then between trial and sentencing they entered an agreement with the United States to waive their appeal in return for various concessions at sentencing. Were you trial counsel for this case? I was not, Your Honor. Unless there are any other questions, we'd ask that you affirm conviction on all counts. Thank you, counsel. All right, Mr. Warren, are you going first? One minute, please. Just one point. The government said that there is no controlling authority requiring the giving of an instruction. Well, I will say that the Supreme Court has said that a defendant is entitled to instructions on all elements of the offense. That's a basic tenet of constitutional law. This is not a 2255 where we need to establish— But it's hard to show plain error if you don't have precedent that's precisely on point. I disagree. I disagree under this case because the instructions for the Pinkerton says they have to show he's a member of the same conspiracy at the time of the attempted obstruction of official proceedings. I don't think to make error plain, the court has this basic instructional duty to instruct on those elements. And as we know, in every case— Didn't the court instruct that they were a member at the time? Yeah. The court gave that instruction that they have to show he's a member at the time, but the court gave no guidance to the jury about how to determine when this conspiracy begins and ends. That's what I'm saying. There's no case that requires that. There's no case that requires the court to go further than giving the instruction that was given. I don't think there's a case except for the case, the Supreme Court case, that says a defendant is entitled to instruction on every element of the offense, and this is every element. And I will say that, I mean, some cases—frequently— But what is the element? The element is the duration of the conspiracy. Instead of dictating that duration, that is an element that the jury gets to decide, given that it only found one sort of slice of those options. That is an element, is the duration of the conspiracy. But there's no case that says that. I have not found a case exactly like this. But like I said, this is not a 2255 situation. The court has a basic instructional duty. But the plain error standard is that there has to be— this error has to be so plain, so obvious, that the court should be able to avoid it without the benefit of counsel raising the issue. So if there is no case that says it, how could it be so obvious or so plain? If there is no case that sets this out, how can it be so plain that the judge should know it? Because the court was told by the government's counsel that each of these potential objects of the conspiracy is active during a different time frame. The court was told of that. We're not asking the court to do bat flips. This is, I think, a basic instructional duty that's called for. The court has to respond to the unique facts of the case. And just giving the stock instructions is fine, but sometimes even those have to be instructed or supplemented. And that's just basic. All right. We understand, Your Honor. Thank you, Your Honor. Thank you. Mr. Hironaka. Thank you, Your Honor. So just a couple comments. I think they're related to each other. On the misconduct related to the improper comment, I just wanted to point out that the comment related to explaining false reports, explaining the lies, and that essentially is what the jury ended up finding the defendants guilty of was the obstruction of justice. So I say that to make the point that the comment was not harmless beyond a reasonable doubt. It definitely made a difference, and that's highlighted by the fact that that is the only thing that the jury convicted the defendants of with respect to the conspiracy charge. That's also related to the – I know this is not necessarily a rebuttal issue, but I did have a briefing on the 3C1.1, where there was an obstruction of justice enhancement imposed on top of the underlying offense of obstruction of justice. So I think the issue there is more properly framed as a double-counting issue, which the Davis case actually warns against doing. So that's also something we definitely need to look at here. We understand your argument. We can assure you we've read the brief, so we know what your arguments are. Thank you. Thank you to all counsel for your helpful arguments in this case. The case just argued is submitted for a decision by the court. We are in recess until 9.30 a.m. tomorrow morning Honolulu time. All rise.
judges: SCHROEDER, RAWLINSON, BRESS